UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

In re:

ROMAN M. VASALLO, &                            CASE NO.: 09-10502-LMK
CELENA VASALLO,

                                                                      CHAPTER: 12

    Debtors.
_____/

## ORDER ON VALUATION

THIS MATTER came before the Court for hearing May 11, 2010, on the Debtors' Notice of Valuation of Creditors Edward J. Barnhill and Karen J. Barnhills' (the "Barnhills") secured claim (Doc. 7), and the Barnhills' objection thereto (Doc. 26). Having reviewed the pleadings and the file, and being otherwise informed on the premises, for the reasons stated more fully herein I find that the value of the Barnhills' secured claim is $385,000.00.

The Debtors, Roman and Celena Vasallo, purchased the property at issue in this valuation from the Barnhills in January of 2006, for the purpose of growing broiler chicken flocks under a contract with a poultry integrator. The purchase included a homestead, land, poultry operations, and improvements, more specifically identified below. The Debtors paid to the Barnhills a purchase price of $600,000.00, which consisted of $120,000.00 in cash and a promissory note and mortgage for $480,000.00. The payments on the promissory note were to be automatically drafted and paid to the Barnhills from the Debtors' growout check from Gold Kist, Inc. ("Gold Kist") poultry company.

After the Debtors closed on the purchase, Gold Kist, the nation's second largest poultry producer, was purchased by Pilgrim's Pride Corp. ("Pilgrim's Pride"), the nation's largest poultry producer. *See* William K. Snyder, *Inside the Turnaround of Pilgrim's Pride*, 2010 AM. BANKR.

1

INST. J. 32. Due to the increased debt burden caused by the merger, as well as higher feed costs and lower demand, Pilgrim's Pride filed for reorganization in December of 2008. *Id.* In its restructuring plan, Pilgrim's Pride reduced production and cancelled many grower contracts, resulting in 762 grower claims totaling at least $180 million. *Id.* Either in conjunction with Pilgrim's Pride's restructuring or for low production, the Debtors' contract to grow broiler chickens was terminated before the Debtors' bankruptcy petition was filed. The plight of the Debtors and hundreds of other contract poultry growers in their position has not gone undocumented in the last few years. *See* Lauren Etter, *Farmers Face Empty-Nest Syndrome Amid Chicken Housing Crisis: Poultry Growers Lose Contracts, Can't Pay Their Pricey Coops; $200,000 Per House*, WALL ST. J., Feb. 12, 2009, at A1; and David Zucchino, *The Nation; There are no Nest Eggs for These Chicken Farmers: After Losing Contracts with Big Processors Because of the Ailing Economy, Many are Stuck with Huge Debts*, L.A. TIMES, Apr. 13, 2009, at 10.

At the present time the mortgaged property located in Mayo, Florida, encompasses 21.46 acres and is comprised of a home, pasture land, improvements, and poultry growing infrastructure. The poultry growing infrastructure includes, among other things, four broiler chicken houses that are each approximately 19,200 square feet, a litter storage building, an equipment barn-apartment, a generator, power unit, transfer switch, and shed. The Debtors currently owe in excess of $469,000.00 on the principal portion of the promissory note.

The Debtors seek for this Court to determine the fair market value of the Barnhills' interest in the estate's interest in the Debtors' property pursuant to 11 U.S.C. § 506(a), for the purpose of determining how much the Debtors have to pay the Barnhills in order to confirm their plan and keep the property. Section 506(a) provides that in arriving at this fair market value, I must make my determination "in light of the purpose of the valuation and the proposed disposition or use of the property." 11 U.S.C. § 506(a)(1).

The Debtors urge the court that the "proposed disposition or use" language in *§ 506(a)* requires me to value the property as the Debtors now subjectively intend to use the property, and not as the property is currently used or as a buyer in a foreclosure sale would use the property. As support, they cite to *In re Bishop*, 339 B.R. 595 (Bankr. D.S.C. 2005), which interprets the Supreme Court's decision in *Associates Commercial Corporation v. Rash*, 520 U.S. 953 (1997), to mean that "consideration must be given to the actual use proposed by the debtor." 339 B.R. at 600. The Debtors then claim that since their poultry growing contract was cancelled, and unlikely to be reinstated in the near future, the property should be valued as a hay farm and rural residential property. Debtors urge that any value attributable to a potential poultry growing contract contract is negligible.

The Barnhills, on the other hand, concur that *In re Bishop*, 339 B.R. 595 (Bankr. D.S.C. 2005) is the most factually relevant case, but they disagree with its reasoning and assert that both its logic and its facts are distinguishable. The Barnhills appear to suggest that *Rash* intended that the "proposed disposition or use" language in *§ 506(a)* mean merely a choice to either "retain and use, or surrender" the collateral. In other words, the Barnhills suggest that the Debtors' subjective intended use is not relevant beyond the mere determination of whether to retain and use, or surrender, and the balance of the analysis should be based upon an objective willing buyer considering the property in its current state.

Even if the subjective intended use in *Bishop* is the proper reading, the Barnhills suggest that the Debtor in our case is not in the same position as the Debtor in *Bishop* for two reasons. First, in *Bishop* the poultry integrator was physically present in court and stated that the integrator would absolutely not deal with that particular poultry grower under any circumstances. The Barnhills suggest that in the Debtors' case, no such absolute bar to future poultry growing contracts exists. Second, the Barnhills suggest that in *Bishop* the secured creditor's intended use

3

was not as the farm currently existed (as a hatchery), but instead as converted to its highest and best use as a broiler chicken growing operation, at a conversion cost of $100,000. In this case, the secured creditor is only suggesting that the property should be valued as it currently exists, a broiler chicken operation, and not as some other use (in fact the Debtors appear to be the only party lobbying for a different intended use – as rural residential and as a hay farm).

Outside of Bankruptcy the Barnhills would be entitled to receive full payment of the amount due on the promissory note, or they would be allowed to exercise their in rem rights by foreclosing and selling the mortgaged property. The amount of their secured claim would be determined as a matter of course through recognized state law enforcement mechanisms, and they would be entitled to pursue payment of the unsecured deficiency claim against the Debtors. In bankruptcy, *§ 506(a)* operates as a substitute for the state law enforcement mechanisms by fixing the value of the secured creditor's legal entitlements so that the property may be used or disposed of in a manner consistent with the goals of the Bankruptcy Code.

While bankruptcy law does not have to exactly mirror what would happen in the state court context, the Debtor cannot simply retain collateral without compensating the secured creditor in full for the value of the collateral. In order to compensate the secured creditor for the full value of the collateral, a valuation under § 506(a) must, at a minimum, be the foreclosure value. Any value less than the foreclosure value would violate the mortgagee's bargained for right to foreclose. In other words, a proposed valuation of property less than foreclosure value necessarily and improperly leads to treatment that is far more beneficial for the Debtor than state-law treatment. If a valuation less than foreclosure value were permissible, there would be a large incentive for debtors to use bankruptcy valuation merely to obtain value from the secured creditor. As noted in Colliers 4-506 P. 506.03, such a rule might increase the cost of secured lending and reduce the availability of secured credit. *See generally Butner v. United States*, 440 U.S. 48 (1979)

4

(bankruptcy law should "prevent a party from receiving a windfall merely by reason of the happenstance of bankruptcy"); *See Also Winthrop Old Farm Nurseries, Inc. v. New Bedford Inst. For Sav.* (*In re Winthrop Old Farm Nurseries, Inc.*), 50 F.3d 72 (1st Cir. 1995) (permitting the debtor to value the collateral on a liquidation basis but retain the property "would allow a reorganizing debtor to reap a windfall by stripping down the line to liquidation value and quickly selling the collateral at fair market value, thus pocketing equity that would have been completely beyond reach save for the filing of the bankruptcy petition").

    The Supreme Court's decision in *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997) was in line with the policy of protecting the secured creditor's rights in bankruptcy, and providing for payment of the full value of the collateral. In *Rash*, the Court addressed the proper valuation of property that is retained in order to generate an income. *Id.* at 963. The debtor wanted to value a commercial tractor trailer used for business purposes at $31,875, the net foreclosure value, for purposes of value in the debtor's Chapter 13 plan. *Id.* at 957. The Supreme Court held that the correct standard under *§ 506(a)* when a debtor chooses to retain and use the collateral is the replacement-value standard, "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain property of like age and condition from a willing seller," a value in this case of approximately $41,000. *Id.* at 957, 960. In reaching this holding, the Court noted that the replacement-value, which is higher than the foreclosure value, accurately gauges the debtor's choice to "use" the collateral under *§ 506(a)(1)*. *Id.* at 963. If the debtor decided to surrender the collateral, the creditor would be able to repossess and sell the collateral at a public sale, making the value of the collateral at the foreclosure price. *Id.* at 962. The replacement-value standard is appropriate if the debtor retains the collateral, because the creditor then is at a greater risk, hence the value should be higher than a foreclosure value. *Id.* at 962-63.

The court in *Bishop* focused on the debtor's actual proposed use in determining value. The court quoted a section of the *Rash* decision that stated, "section 506(a) calls for the value the property possesses in light of the disposition or use in fact proposed, not the various dispositions or uses that might have been proposed," 339 B.R. at 600 (quoting *Rash,* 520 U.S. at 964) to argue that the value should be based on the debtor's actual proposed use of the collateral. However, *Rash* intended to ignore any hypothetical uses of the collateral, and instead intended to simply focus on the fact that the debtor was using the collateral *rather* than surrendering it. *Bishop* used neither the replacement value nor the foreclosure value, coming up with a "use standard" which the Supreme Court in *Rash* intended to avoid. The Court in *Rash* stated that it wanted to make a valuation standard that was predictable and uniform and sought to avoid using different valuation standards based on the facts and circumstances of individual cases. *See* 520 U.S. 953, 965.

Having determined that the appropriate standard of valuation is replacement value, I must establish the price a willing buyer in the Debtors' trade, business, or situation would pay to obtain property of like age and condition from a willing seller. Specifically, in light of the evidence presented, I must determine the price an individual with history in the broiler chicken farming business, but without a current contract, would pay to obtain a home and farm with poultry infrastructure and other improvements of like age and condition.

Three appraisals of the property were admitted into evidence during the hearing. The Debtors offered two appraisals, and the Barnhills offered one. The first an appraisal by Matthew M. Earnest which valued the property as rural residential and did not assign any value to the poultry improvements, estimated the value of the property to be $102,000.00 as of February 13, 2010. This appraisal, contemplating a different use for the property and not assigning any value to the poultry improvements is of little value. The second appraisal of the Debtors by Lawrence H. Saucer, valued the property as is with improvements, but under the assumption that a poultry

growing contract could not be obtained and that the poultry improvements were designated for alternative use. This appraisal valued the property at $168,000.00 as of May 9, 2010, and noted that the inability to obtain a poultry growing contract significantly reduced the property value. The Barnhills submitted one appraisal by Kevin W. Brown, which assumed a poultry contract had been obtained and that the farm was suitable for chicken growing operations. The Barnhills appraisal valued the property at $600,000.00 as of April 7, 2010.

The evidence presented at the hearing as to the probability of obtaining a chicken growing contract was vague at best. The Debtors' appraiser, Lawrence Saucer, stated that the assumption in his appraisal that a poultry growing contract could not be obtained was based upon a conversation he had with Mr. Todd Grisham, broiler manager with Pilgrim's Pride, on May 7, 2010, in which Mr. Saucer asked Mr. Grisham what the odds were of an unnamed purchaser obtaining a contract at this present time. The response from Mr. Grisham was that it was not likely. However, Mr. Saucer also testified that a new owner or the Vasallos could have a better chance at obtaining a contract if they have a history of past positive performance. The creditor then provided a myriad of anecdotal evidence to suggest that Pilgrim's Pride is currently bringing on more formerly operational chicken growers, due to the corporations emergence from bankruptcy in December of 2009. Since Pilgrim's Pride's emergence from bankruptcy, at least one major broiler chicken operation in the region has been brought back under contract, and Pilgrim's Pride appears to be ramping up production nationwide. Mr. Barnhill then testified that with his nineteen years of experience in the industry he thought that he had at least a fifty-fifty chance of obtaining a poultry growing contract if he got the farm back.

All of the appraisals entered into evidence used comparable sales in their respective comparable sales approaches that, with the exception of one, occurred well before Pilgrim's Pride entered into bankruptcy in December of 2008. Only one comparable sale had occurred after Pil-

grim's Pride emerged from bankruptcy in December of 2009, and I am persuaded by the anecdotal evidence that suggests that some of the farmers whose contracts were previously terminated before Pilgrim's Pride's emergence from bankruptcy, are now back in production. For the same reason that many of the comparable sales are not instructive, likewise much of the testimony regarding contract poultry grower terminations and re-instatements over the last two years, before and during Pilgrim's Pride's restructuring, are not indicative of future prospects.

Based on the flimsy evidence presented, I can only conclude that the likely potential for an owner of this farm obtaining a contract for poultry operations is roughly fifty-fifty. The testimony at the hearing suggested that both the Debtor and the Barnhills more-or-less agree on a value for the land and improvements excluding the poultry growing contract prospects. The Debtors' value of $168,000.00 was based on the assumption that a chicken growing contract could not be obtained. The Barnhills' value of $600,000.00 was based upon the assumption that a chicken growing contract was in place. In light of my findings regarding the prospects for a growing contract, a figure close to midpoint between the two values of $385,000.00 appears to be the most likely replacement value for the property at issue. Accordingly, it is hereby

ORDERED and ADJUDGED that the Barnhills' Secured Claim is determined to be $385,000.00.

DONE and ORDERED in Tallahassee, Florida this 24 day of May, 2010.

/s/ Lewis M. Killian, Jr.
LEWIS M. KILLIAN, JR.
United States Bankruptcy Judge

cc: all parties in interest